Thank you very much, Your Honor. May it please the Court. Law Enforcing on behalf of the Real Parties and Interests, this is an attorney fees case arising under Section 406B of the Social Security Act. The question is whether the contingency fee contracts entered into by Mr. Shapiro, Mr. Cho, and Mrs. Haley should be entitled to a mild presumption of reasonableness and whether it was reasonable at the time, at the outset of representation for the claimants to enter into these contingency fee contracts and looking backwards in time whether the claimant got the benefit of the bargain. I think that is the hallmark of reasonableness under the 406B test as articulated in Gisbrecht v. Barnhart. The important question is the character of representation and the results achieved. In each of these cases, after a remand, a stipulated remand from the district court, the attorneys, each individual attorney represented their clients and were able to obtain substantial payment of past due benefits for their clients and sought fees after a reduction for reasonableness and that. Could you help me on something here? Certainly, Your Honor. In Gisbrecht, I certainly could see every bit of the point that the majority articulated here. I'm a little concerned about how to construe the word reasonable. Justice Scalia makes the point in dissent that it's kind of hard to say what it means if it doesn't mean lodestar. I am pretty sure that it doesn't for the reasons you say. But can you articulate some formula? Here's what I'm thinking about. When I did contingency fee litigation, every now and then you'd get a plane crash case where the airline had offered some conceded liability and offered a lot of money, and a client would come in. Most of the PI bar was satisfied that you couldn't charge a third reasonably of whatever you got for the client. You'd maybe charge 50 percent of what you got on top of the airline's offer. There, it's really easy to put your finger on what's unreasonable. The client should come out better after the lawyer came into the case for the client. And here I don't know what sort of practice there is among Social Security lawyers that would inform the notion of reasonableness. Can you tell us? When each of these cases goes to the district court in the nature of an appeal, an administrative appeal, the administration has denied the case initially on reconsideration at an ALJ hearing and before the Appeals Council. Sure. So getting the whole contingent fee on the whole award makes perfect sense in that context. But what's unreasonable? Well, unreasonable would be if the government developed the transcript and looked at it and all the lawyer did was file a complaint and the government called up and said, you know, we've looked at this transcript now. We're not even going to file an answer. We're going to remand this case today. In that kind of case, there's a certain degree of windfall in that circumstance to allow substantial fees under that context. In each of these cases, each of the lawyers looked at the file that Mrs. Haley did handle the administrative hearing, but Mr. Cho and Mr. Shapiro did not. The first time they got this case was on appeal. They looked at the transcript, identified the issues, and pointed out to the administration, this is the error of the ALJ's ways in this particular method, and we should remand this case. And the government agreed to remand the case without further litigation. I think in those circumstances, the plaintiff got the benefit of the bargain. In both Trejo, the case that Mrs. Haley handled, and in Crawford, the case that Mr. Shapiro handled, both of those cases required two administrative hearings with an intervening Appeals Council hearing on remand. So there were substantial risks. We see that. The Trejo complaint was filed in 1998, and there wasn't a notice of award from the administration until June of 2006. That's just one month shy of eight years. In Crawford, the complaint was filed in November of 2000, and the notice of award was published in January of 2006. In Washington, the complaint was filed in September of 2003, and the notice of award was in November of 2005. So we see the count. So here, even where the government caved, it was still six years of litigation before they did? Correct. Correct. So these are not fall-off-the-log, easy cases to win, because as the agency statistics bear out, when the plaintiff obtains a remand in a Social Security case, the plaintiffs win only 60 to 65 percent of the time. There is still a risk. And the plaintiff's bar only wins half of their cases overall. So when a lawyer, when a young lawyer decides that they're going to practice Social Security law, they're looking and they're going to take cases in federal court because they're brazen or not very smart, they're looking. Or maybe they're former law clerks. Or maybe they're former law clerks. I was neither. They're looking at they're going to win a third of their cases. They're going to get a chance to collect 406A and or 406B fees in a third of their cases. And when you win a third of your cases, and Judge Nakazato and Judge Block indicate that our firm wins 60 to 65. I don't have any problem with the idea of contingent fees. Right. What I'm asking you for is a verbal formula. If you could write the opinion, what would the paragraph in the opinion say unreasonable means? Unreasonable would mean that I can only identify it by example. Unreasonable would be the government decides to pay benefits after the filing of a complaint. I don't think an attorney is entitled to a huge amount of fees for filing a complaint. Doesn't Ginsberg give a couple of examples? Maybe you can answer this question by reference to this language and maybe explain it to me as well. I'm now reading from the U.S. report's version of opinion on page 808. And the one example that Justice Ginsberg gives is if the attorney is responsible for delay, the attorney drags out the case in order to make the back pay award. Is it called back pay? Past due benefits. Right. But essentially through the passage of time, the lump sum becomes bigger, and the lawyer essentially, through misfeasance or malfeasance or neglect, winds up getting more money because he's dragging it out. So that's one example. I understand that one very well. It's the next sentence that I think is troublesome for you, or so I can answer in response to this question. It says, if the benefits are large in comparison to the amount of time a downward adjustment is similarly in order. Why isn't this exactly a situation like the cases you talked about where the lawyer didn't do much litigating, he just looked at the, you know, and got a very good result by just calling up and persuading the government's lawyer right there and then, you know, you should pay him, and he did. And it's extremely good legal work, terribly good for the client, and I wouldn't have opposed this opinion. But here it is. It's an opinion of the Supreme Court. Why isn't this a sufficient basis for us to say that the district court's determination of the demand was unreasonable has to be sustained? That reason standing by itself does not take into account the Georgia Highway or Kern versus Screen Actors Guild factor of expertise. And Mr. Shapiro, Mr. Cho, Mrs. Haley, this is all they do. But I thought that the district court, at least, I get these orders mixed up, but there were three different orders, and at least in one of them, and perhaps in all three, the magistrate judge gave, this is your firm, right? Correct. And said, basically, you're top of the line, you're the Cadillac in the field. Yes. We all know it's true. And so, you know, we're willing to give you sort of the 90th percentile of fees. So it seems to me they did take expertise into account. But when you take it into account. What they didn't take into account is the risk that you won't get paid at all. I mean, that's absent both from Gisbert and the district court's opinion. The phrase, the windfall, when the benefits are large in comparison to the amount of time expended, when you give the lawyer the higher hourly rate, assuming a hypothetical hourly rate is appropriate, and say, because you were efficient and expert at performing these functions, you were able to do it more quickly than a lawyer with less expertise or less experience or less devotion to this type of litigation, I think that that is double-counting that factor, both as a positive and a negative. And by counting it twice, you're giving and then taking away the benefit of expertise.  But there was a number of other factors that were involved, and that was the increase in the fee. But there were two things. First, the district court did, in fact, give you what he called enhancements in each of the cases, in some instances quite substantial. Now, I understand that you object to even measuring it by the lodestar figure, but it isn't true that he simply gave you the hourly fee. Your Honor, if I tell a lawyer that if you work for me for eight years, you're going to get 140 percent of what you should have made eight years ago, I don't think I'm going to get many takers. And the purpose of the courts one of the functions of the court in assigning fees is to attract competent counsel. And I thank Judge Kozinski for the compliment, but there are a lot of really good lawyers out there that don't do this kind of work because they don't feel that they can get the kind of compensation they can get in other fields of law. And a 40 percent compensation after six years of litigation, which is the case in Crawford, or a 40 percent enhancement, the same enhancement in Washington after two and a half, a little over two years of litigation with roughly the same amount of benefits. There isn't an assessment of risk. Clearly, Mr. Shapiro sustained or shouldered a greater burden of loss of not getting paid at all. He had to wait six years to get freed and the opportunity to apply for fees. And Mr. Cho had to wait a little over two years for the opportunity to apply for fees. So we don't have the delay in getting payment factored in. Kagan. The district judge seemed to view the Washington case as the kind that you're positing because he said that it was just so easy, that there was really nothing you had to do. Is that an unfair characterization? I'm sorry. Say that again, Your Honor. He seemed to posit the Washington case as being the kind of case that you're saying would be a win for him because he said it was just so obvious of the ALJ error that there was really nothing you had to do. If it was so obvious that the ALJ error, why didn't the appeals counsel pick it up? Why didn't the ALJ pick it up? Well, but then you're eliminating the category. I mean, you began with a category, which is there is a category of cases to which this win-or-fall notion applies. And you said it was one in which all you had to do was just blink and there was a remand. And he's saying that's what this one was. And yet, if we look at Washington and Crawford, in Washington, the Equal Access to Justice Act was smaller than in Crawford, and yet the 406B fee is larger in Washington. That's simply by virtue of the amount of the award, isn't it? No, the amount of the award was larger in Crawford. There was a larger award and a longer period of delay in Crawford than there was in Washington. There was a smaller award and a much shorter, less than half the period of delay in Washington, and the judge still used the same 1.4 multiplier. And that doesn't account for the significant risk and delay that Mr. Shapiro shouldered in Crawford. In Washington, I don't think it was such a slam dunk. I think there are instances where the government doesn't answer and they're willing to remand. It doesn't happen very often. But generally, the administration puts the plaintiff's bar to the task of proving up the error in the ALJ's decision. And most lawyers, the government statistics tell us that 70 percent of claimants are represented at a hearing, and 90 percent, 90-plus percent of those claimants that lose in a hearing before an ALJ go to the appeals council, but only 12 to 14 percent of those same claimants that lose before the appeals council come to federal court. And as ‑‑ Counsel, I'd like to kind of turn you to thinking about this possibly a different way. Congress said 25 percent would be allowed. Yes. But that in certain instances, you should reduce the fee because of certain circumstances. Now, here, the fees were voluntarily reduced by counsel. One case, 13.95 percent was the fee. The highest one was 16.95 percent. Now, what reasoning did the lawyers go through in adjusting their fees? In Washington and Crawford, the fee agreements do not contain language that ‑‑ they didn't have the presence to foresee Clark versus Astro, and so they only allowed an aggregate fee of 25 percent. So the attorneys made an allowance for the presence of a 406A fee and then made an adjustment to reflect a good faith estimation of lowering the fee and making sure that the client got the benefit of the bargain. In Crawford, there's a smaller 406A fee, so Mr. Shapiro asked for a larger 406B fee to keep it within the 25 ‑‑ just under the 25 percent parameter. The Trejo case doesn't have that problem, as it were. Can you explain the problem? The problem has to do with what fees they get on the administrative part of it, is that it? Yes. For instance, in the Washington case, the retainer agreement says that the fee, if it's reversed at any other stage, is 25 percent of the back pay, without specification and differentiation between A and B. But in Trejo, the administrative fees and court fees are dealt with separately, and it says that the court fee is a separate 25 percent, which conforms to the statute in this Court's reading of the statute in Clark versus Astro, so that it's a separate calculation. I'm saying that the reduction was really to deal with that contractual problem and wasn't really a judgment of reasonableness. Well, it still doesn't equal the 25 percent. There is some reduction, and there's still the obligation to repay directly to the claimant the equal access to Justice Act fee, the smaller of the two fees. So there is some reduction. There is a measure of reasonableness. There isn't any overreaching or trying to stretch a contract beyond its reasonable reaching point and the expectation of the client. I guess the way I understood Judge Fletcher's question, because it was bothering me as well, is what weight or deference should be given to the fact that you come in with a reduced fee to begin with? I think that when an attorney looks at the results achieved and looks at the character representation and makes a good-faith reduction in fees to make allowances for what the Supreme Court identified, that that should be an indication that counsel has exercised billing judgment. And that should be a factor in the court's consideration. It's a complicated thing on what basis. I mean, it's also amorphous, both on your end and on the Court's end. Sometimes there are certain things that we just can't say about why we act because it's privileged. And sometimes it's just because I really like the person and I want to give them a break. I'm a human being. Can I ask a question? Sure. You started out your argument by saying that we should indulge, quote, a mild presumption as to the amount of the contingency contract. I have two questions. Number one, I thought that Justice Ginsburg said in Gilchrist, the attorney for the successful cleanup must show that the fee sought is reasonable for the services rendered. The burden of proof remains on the attorney at all times. Right. There's no language about a presumption in there. I mean, that might be hortatory on your side of advocacy, but it's not there, is it, in the decision? As Judge Kleinfeld noted, Justice Scalia used the phrase Now, let's suppose that you're right. Let's suppose that we start at the top with the contingency agreement. What elements do you think are justified to consider to lower that fee, if any, other than the case that you've given twice, which is you file a complaint and you get a windfall? Let's forget that. Are there any elements that you can point out other than by example? For instance, in Washington, there's only a little over a two-year delay. I think that's a factor. How long did the attorney wait to get paid? That is a factor that should be considered. Another factor that should be considered is the risk in the class of cases, the 35 percent figure. That has to be considered as an express realization. Let's work on that. There's a 35 percent risk. Does that mean that if you have a $20,000 contingency contract, you multiply it by 35 percent and come out with $7,000, or do you multiply it by 65 percent and come out with $13,000? Tell me how that works. If, as the concurrence and dissent in Delaware II indicates, that contingency fees are paid at a premium, and also Chief Justice Berger's concurrence, if contingency fees are paid at a premium, then we have to get from 35 percent to something over 1.0. And the statistics that we presented to the district court indicate that contingency fee lawyers in general make 50 percent more in the aggregate gross amount than their hourly counterparts. So I think that something in the range of 4.0 to 5.0 is a reasonable assessment of the risk, aside from the delay. And in none of these cases did the lawyers ask for anything close to even a 4.0. Mrs. Haley asked for something less than 2.5, and she came up to $24,000. And the interesting part is that the ---- Did you get those numbers, 4.0 and 5.0, from the class action security field? No. I get that by trying to get to 1.5 in the final analysis. And if I say that the average lawyer is going to win 35 percent of their cases, factoring in all of the vagaries of the Equal Access to Justice Act fees, making additions and subtractions and the geometric progressions, that 4.0 multiplied times 35 percent is 140 percent. And factoring the EJF fees on the cases that were lost on remand, you get something close to 1.5. So something in the Sixth Circuit in Hays said 2.0 because Social Security claimants win half their cases. Well, they don't win quite half. So a 4.0, I think, is a reasonable place to start in terms of the risk of the class of cases, and then you start from there. Counsel, do you get fees in all the wins? I thought equal access to justice, when I did it as a district judge, it meant that the government position had to be not just a position that ultimately lost, but I think substantially unjustified was the statutory language or something to that effect. Lacking substantial justification, yes. Is it custom in Social Security that if you win, you get fees as though it was a straight fee shift? Well, it's at a reduced hourly rate. It's only $170 an hour now. Hold on. Remember what my question was? Yes. And we resolve well over 90 percent of our fee applications with the Office of General Counsel, and we stipulate to the fees in almost every case that we win. I didn't get the question. We get paid equal access to justice act fees in almost every case that we win. That's what I wanted to know. Almost every case. So in order to come out the same as you would if you were charging by the hour, you really need three or four times the load star on account of the risk factor. Yes. But no more. Yes. Now, in personal injury litigation, when you get your client a future stream of income, you get a contingency against the future stream. People that have done a lot of PI cases, often the lawyers have some annuities because of structured settlements. Right. In Social Security, am I understanding correctly, you don't get anything for the future stream of income you get your client? Nothing for the future income stream and nothing for the Medicare coverage or Medi-Cal coverage. Just for the back pay? Just the back pay. Just the back pay. Nothing for the back medical benefits that are paid? Nothing. You don't get an administrative fee on top of your contingency on the back pay. You do get an administrative fee for work done before the administration. That is a separate fee, but the administration only holds 125 percent. I'm sorry. I misunderstood that. What did you say? The administration withholds 25 percent of the past due benefits, and it's up to counsel to collect that, whatever the administration and the courts authorize, out of that 25 percent directly from the administration. So you can actually get 25 percent on the administrative representation and 25 percent on the court administration representation and thereby get 50 percent of the same amount of back fees, back pay? None of the lawyers in these three cases have asked for that. None of them have done that. And I'm not aware of any lawyer in the country that has tried to get 50 percent of the back pay award. But Clark v. Astor does permit that, but neither of them. Can you say that your current contracts permit it? It calls for a separate calculation, and it also requires that full disclosure be made to the administration and to the court. And so when we file fee petitions, we advise the court what we're asking for administratively. And when we file for an administrative fee, we advise the administrative law judge or the attorney fee branch of the administration what we're asking for from the court so that both the court and the administration know what's being asked for. Mr. Rothenberg. More than 25 percent of past due Social Security benefits? Yes. Is that what you're saying? I'm saying that that's what Clark says. But none of the lawyers in my office do that. Your 140 percent. How did you get to 140 percent? I've also asked part of that question. The fee surveys that we attach to our fee motions that are in the excerpts of record, the small firm economic surveys indicate that contingency fee lawyers make between 150 percent to 152 percent of what their hourly counterparts make, that contingency fee lawyers, because of the risk and the time delays, they end up making more money in the long run. Otherwise, there's no incentive to do contingency fee work. Counsel. Where's the money now? Where's the money now? The administration is obligated by statute to withhold the money. And as far as I know, the administration continues to withhold. They've paid the award minus what you have claimed. Yes. As your fee. And that's being held by the administration. Yes. Or minus the whole 25 percent. They're holding more than you are asking for. They are holding more than what I'm asking for. They withhold the entire 25 percent until all the fees are resolved. And to the extent you don't get that money, it goes to your clients. It will go to your clients. Yes. There are some circumstances that are not relevant here when it would not, but in most. Let me ask a somewhat delicate question. Is there a tension between you and your clients on this issue? Yes, there is. And that's why. I realize this is not under statutes. I'm not suggesting anything. I'm just. Where do they stand on this? Do we know? Do we need to hear from them? None of our clients have ever objected to. None of these three clients have ever objected to the fees, either administratively or in court. And they've been kept apprised and given notice of all of the fee applications and given the opportunity to correspond with both the U.S. attorney or regional counsel or my office. And had they said something, we would have delivered it to the court so that the court would know. So when you said there's a tension, you mean the contingent fee system. Inherently, there's a tension. Yes, there's always a tension. None in your case. No. There's no actual tension. No, there is a possible tension. Inherent tension. Yes. Structural tension. Would you like to save two minutes for order? Yes, please. Thank you. But who turns you down here? The client turns you down, says you're charging me too much? We have to get it approved by the district court. The district court cut it down. Correct. The district court cut it down so sponte. Even though there's no objection from the client? And no objection from the administration, really. Okay. We'll give you two minutes. Thank you. We'll hear from the commissioner. The commissioner of Social Security, right? Correct, Your Honor. Good afternoon. My name is Michael Robinson. I'm with Justice Department. I represent the commissioner on this appeal. With me at counsel's table is Leo Montenegro from the Social Security Administration. Counsel just said that there had been no objection by the commissioner, that the court cut this down so sponte. Is that correct? The commissioner did not take a position at the district court level. Then why are you doing it here? Well, he's doing it here because on a bank, somebody asked for the government's position. That was the first point at which you came in. Correct, Your Honor. But you didn't appear. You not only didn't file briefs before the panel, but you also didn't appear in an argument before the panel? That's correct, Your Honor. This is the first time you've been actually physical present. Correct. You just won a trip to Seattle. Thank you. I think that the bench has recognized that the crux of the holding in Gisbrecht is at page 808 of that opinion. Such as it is. Such as it is. But it says that courts are to approach the fee determination under 406B first by looking to the contingent fee agreement and then testing it for reasonableness. So what factors would you say we should look to for reasonableness? Well, it says, following down on that same page, it says if the benefits are large in comparison to the amount of the this is in addition to the other factors like the delay that might be caused by counsel overreaching and so forth, which the district court found here that did not exist. But the court went on to say in analyzing reasonableness, it says if the benefits are large in comparison to the amount of time counsel spent on the case, a downward adjustment is similarly in order. But there already was a downward adjustment in each of these cases. This doesn't tell you anything about how to do that downward adjustment. It does. The very next sentence the court says, in this regard, the court may require the claimant's attorney to submit as an aid to the court's assessment of the reasonableness of the fee yielded by the fee agreement a record of the hours spent representing the claimant and a statement of the lawyer's normal hourly billing charge for non-contingency fee cases. So there's nothing in this case that would require deference to a self-imposed reduction by the attorney? Absolutely not, Your Honor. This is an independent check that the court is supposed to apply in analyzing reasonableness. And in this regard, and that last language, the court suggested – I'm sorry. But in applying the reasonableness standard, do you start at 25 percent or do you start at whatever they ask? I think that you can start at – if they don't voluntarily lower the amount, as in this case, you can start at the 25 percent and see if that yields a reasonable amount. One of the things that Ginsburg suggests is what Congress was really concerned about in these cases, and that is that the amount of effort expended by the attorney is not necessarily related to the amount of award of past due benefits. And in those cases, the court quoting from the legislative history suggested at page 804, Congress was mindful, too, that the longer the litigation persisted, the greater the buildup of past due benefits and correspondingly of legal fees awarded from those benefits. So really it does seem to – that what Gisbrecht is trying to get at is the fact that the – in certain circumstances, the fee request or the fee request is going to be – or that the fee amount may be – and so the longer it takes to straighten the thing out, i.e., 8 years in one of these instances, the less the lawyers can get. No, Your Honor. I don't think it's about the recalcitrance of government. Sometimes the administrative proceedings take a long time. But what the court was really concerned about was the amount of hours that the attorney put into the case and the resulting amount of past due benefits. And I don't think it's about the recalcitrance of government.  put into the case and the resulting amount of past due benefits. But aren't these sort of typical run-of-the-mill cases? Is there anything special about these three cases? I don't think there was anything special about these three cases. And in each instance, the Commissioner stipulated to a remand, and so – And the reason I say that is because the more they know about the area, the more they're going to be able relatively quickly to come up with – and we do these cases, so we know how hard they are to read the records. And one does have to develop some expertise in doing it. In each case, they seem to have written a letter which said not just, this wasn't any good. It wasn't any good because of A, B, and C. Your Honor, it is true, and the court in this case, when it looked at the lodestar amount, did take into account the expertise by setting the fee in the ninth decile or the upper 10%. And it said that that was an appropriate fee because the counsel did not provide an hourly rate. And the court said, well, we'll take a general market rate and award at the ninth decile. But that sounds to me like – this case says that the contingent fee agreement is the primary means for setting the fees. And you say this is an average case, and yet you really don't let them have a contingent fee. Don't you agree that the district court and magistrates were starting at the wrong end? Ginsburg says start with the contingent fee and go down if these other factors are there. Your Honor, I respectfully disagree. Gisbert does not specify a particular methodology whether you have to go down mechanically from the – What does primary means mean? It says the court must look at the contingency fee and see if it yields a reasonable amount. In looking at what you – in determining what is a reasonable amount, the court is to be guided by a basically a lodestar calculation, a rough calculation. What does a contingent fee have to do with it at all? If you just look at the fee and see if it's a reasonable amount, and then you say, well, we set a reasonable amount with a lodestar. You might as well forget the contingency fee. No, Your Honor. They continue – Did you look at the case which the Supreme Court reversed? Yes, Your Honor. But I also looked at some of the cases that the Supreme Court cites with approval in that case, both, for example, McGuire v. Sullivan and Wells v. Sullivan. Both of those cases involved a situation in which the court said that we will authorize an enhancement to take into account the risk of nonpayment in those cases. Mr. Robinson, let's talk about the enhancements. In these three cases, the district court found 40 percent, 40 percent, and 100 percent. That's correct, Your Honor. Now, where did they get the 40 percent? Why did they get the 100 percent? There's not a word, much less a clear, concise explanation such as Hensley and our own case, Moreno, require in different areas. But there's not a word of explanation of why they popped up 40 percent and not 250 percent. Your Honor, the – This court says that the district courts are generally capable of making a determination of how much to – Well, that's an explanation. The explanation in this court and the Gates v. Duke-Major case said when you're talking about a relatively modest amount of fees, you don't have to make an explanation with laser-like precision. Now, in fact, the court used a meat-ass approach, that you can use a rough percentage amount. In the Moreno case, I think the Chief Judge wrote an opinion saying that that is a 10 percent haircut. You don't have to give an explanation, but when you get beyond 10 percent, and in these cases the haircut was much more than 10 percent, can the district court not give any explanation as to how it arrives at that? Isn't Moreno and those cases – aren't they really fee-shifting cases? And this is not a fee-shifting case at all, but this is, in fact, a different kind of case. The court said we're to look at the benefits are large in comparison to the total time spent. Your Honor, that's entirely correct. The point in fee-shifting kinds of cases is that the court has to balance out what is fair to attract a reasonable counsel and also – I mean, it's looking at the fairness to both the plaintiff and to the defendant. Ginsburg. There has to be less discretion in these cases necessarily because there is an agreement, there is a congressional limit, and it is within – it's really an unconscionability sort of a standard, essentially. It has to be some reason to not enforce a contract. Your Honor, it's stated in Gisbret what the court is to consider in terms of reasonableness, and one of the things specifically that the court was concerned about was the amount of time spent on a case compared to the amount of the other cases. And that's after a very long disquisition. I'm sorry. When you focus on that sentence, it seems to me you're ignoring the next one, which says not as a basis but as an aid to assessment. They very carefully limited and qualified the language. What's that? I take lawyers who get paid on about a third of their cases, and all they get paid on is the back pay award, not the future stream of income and benefits. And then I take how many hours they spent on the case and what a reasonable hourly rate is for the case, and if I use that as a basis for pay, and then I enhance it a little bit, this or that, even though the client agreed to 25 percent, then what I'm saying is social security disability lawyers, lawyers who are willing to take those cases, make around a quarter or a third as much per hour as lawyers who do hourly work, which means either no lawyers do disability in a town. A big city will always have somebody that does it. In a small town, you won't. It means either no lawyers do social security disability work or bottom-of-the-barrel lawyers do it. And it seems so plain, both that Congress in the statute where they said 25 percent and the Supreme Court in Gisbrecht where they reversed the Ninth Circuit for focusing on hours times the rate, they said the opposite. I don't see why you keep turning us back to hours times hourly rate. The problem with the Court of Appeals' decision in Gisbrecht was that the court could rely solely on the Lodestar amount and that that was not going to be reviewed for abuse of discretion, that what Gisbrecht says is, no, when you have a contingency fee, you should look at basically Lodestar Plus. You have to ---- No, they don't. They say the opposite. They say start with the contingent fee agreement and then test it for reasonableness. One of the things you can consider, we have called since the 70s when hourly billing became popular, you can look at this hourly billing, but you can't use it as a basis for satellite litigation, which is to say the amount of the award. But it was ---- but that language reflects what the court was concerned about and also reflects what Congress was concerned about in determining what was reasonable. Absolutely. It says reasonable. Congress said 25 percent. And what the key ---- That's what they told us. What the Supreme Court also said, there are two lines of authority. There are circuits that use the contingency fee as a starting point, and there is a Ninth Circuit which uses the Lodestar. We are reversing that. We are reversing the use of the Lodestar alone. The court says the decision for us for review rests on Lodestar calculations and rejects the primacy of lawful attorney-client fee agreements. We reverse the judgment. Yes, Your Honor. That means the attorney fee, client fee arrangement is prime. That is true, Your Honor. Insofar as the attorney fee agreement yields a reasonable amount, the court said that the court could assess reasonableness by asking for a statement of the lawyer's normal hourly billing charge for non-contingency fee cases and a record of the hours spent. The court at least believed that you could ---- you would consider this, those two factors, in assessing reasonableness. That's what we're suggesting here. Let me ask you a question, if I could. It seems to me, and maybe change the emphasis just a little bit. In general, a district court's decision to award attorney's fees is reviewed for abuse of discretion. Correct? Yes, Your Honor. And the only time we get into a de novo review is when the elements of the legal analysis or the statutory interpretation that figure into the district court's fees decision are the problem. Correct? Correct, Your Honor. So if we look at Giesbrecht and we say Giesbrecht says to look first at the fee, contingent fee agreement, then it says we look at delay, and then it says we look at benefits that are large in comparison to the time spent, it seems to me that the district courts have applied the analysis in Giesbrecht, have they not? Exactly, Your Honor. And so therefore, if we're going to argue about how much we pay, we're really looking at abuse of discretion determination, are we not? Yes, Your Honor. And that's emphasized by the final line in that paragraph. And so therefore, they say in Giesbrecht again, judges of our district court are accustomed to making reasonableness determinations, and theirs are ordinarily qualified for a highly respectful review. That's exactly correct, Your Honor. Your Honor, and that's what the district court did in each of these three cases. It considered these factors. That's not what it didn't do. The question presented in Giesbrecht, which is a hard opinion to parse, was what is the appropriate starting point for judicial termination? Is it the contingent fee agreement or the loan start? Now, he mentioned the contingent fee, but what he actually did in his calculation was calculate the loan start and then add an enhancement called enhancement. So he didn't begin with the contingent fee procedurally. Let me ask you this. I wouldn't mind hearing an answer. It's a higher fee for a lawyer who practices in this field. If you start with the contingent, 25 percent contingency, and then work down, or you start with a loan start and work up? That reflects exactly, I think, the distinction that's drawn between the panel majority and the dissent in this particular case. What produces the most amount of money for the lawyer? Well, if you automatically award a 25 percent in every case, that would be. No, no, I said you start with a 25 percent and you work down. Or you start with a loan start and maybe you work up. I'm not so certain that you can tell whether one is going to pay you more or less. What we're trying to do is that at the end of the day. It's a mindset. It's a mindset. If you start out with 25, you're probably going to end up awarding a higher number for attorney's fees. If you start out with this crazy loan start business that's just been around for, what, 30 years or so? Which has really kind of corrupted the whole practice of law. I'm not saying someone works 20 hours that they're somehow entitled to $500 an hour or $300 an hour. That's just sort of makeshift as far as I'm concerned. What you have to look at is what are the benefits achieved? And they took these cases. They got a good result. They're getting less than 25 percent. They're getting, what, 16 percent, 14 percent, even maybe less than that on some of these cases. It seems to me if you start out with a 25 percent, which Congress tells you to do, you're going to end up with a more generous attorney fee. And who pays the costs for depositions and medical expenses and all that in these cases? Where does the money come from? Does the government advance it? Does it claim it? Who pays that money? The government doesn't advance that kind of money. It's the lawyer that's laying out the money. Mr. Robinson, let me turn your attention back. Can you answer my question? I want to know, too. Who pays for the depositions and when? The government does not advance those, to my knowledge, those costs. So to the extent that they would be taken up front, they would be paid by the attorney. Who pays the doctors to show up at the hearing or prepare their letters? These costs may be recoverable under at the end of the day, but I'm not sure. But those are actually all occurring in the administrative proceeding anyway, right?  But what about – I didn't understand the part about – Well, how are they part of an administrative proceeding? Because in district court, you don't – you're just reviewing the administrative record, aren't you? Correct, Your Honor. Somebody paid for the – paid for it initially. Well, that's what you're talking about, the administrative proceeding. Mr. Robinson, can I get you to take another look at page 808 of Gisbeck? I know you probably know it by heart by now. Yes, thank you, Your Honor. I'm just trying to get your attention to it. Where the court says this, they have a little page, the attorney is responsible for delay, for example. And it has this one sentence, which we know what it means, and it has the next sentence, which is sort of the tense we've been sort of noodling with, if the benefits are large in comparison, and so on. Now, do you think this is an exclusive list of considerations? Are we free to add to this list of considerations the kind of – we are sitting as a court of appeals and as an in-bank court – the kind of issues that a district court ought to take into account in determining the reasonableness of the contingent fee agreement? And for example, you know, the kind of things we have been talking about, things like the likelihood of getting paid at all, the costs that are borne on the way towards a recovery, and so on. Are we free to add to this list and make a more comprehensive list, or do you think what the court said there is exclusive? I believe that the court can consider more than just these particular factors. Well, of course, we don't consider. We review. Are we free to say district courts in our circuit, in passing all these things, will take into account not only these two issues, but also, you know, a handful of other considerations that seem to us to be relevant to the reasonableness of the contingency fee determination. I believe that Gisbert allows you to consider more than just those two factors. But I think that if we go back to what the issue here is, is whether the district court applied – looked at those factors in addition to the factors about the size of the award – size of the past due benefits and the amount of hours that were spent here. And the court determined that a straight award of the contingency fee, even a straight award of the amount that was requested, would have been unreasonable. So it considered other factors like the contingency of nonpayment, and having done so, it reached a reasonable amount. The question is, did the court abuse its discretion in doing it that way? I believe that the answer is no. The — Roberts. Counsel, I'm wondering if it did, and here's why. If you start with maybe a 35 percent recovery rate on attorney's fees, plus the lawyer has to lay out expenses, I would think that in order to make lawyers indifferent between SSI cases and other cases economically, you'd have to start, when you looked at the hours and rates as a – not as a basis for satellite litigation, but as an aid to the court's assessment, you'd have to start out by multiplying by four in order to have a reasonable measure of what the lawyer's time and advanced expenses ought to be worth as a rough measure of reasonableness. If you don't measure by four, then it's like what the Veterans Administration used to do. They limited attorney's fees to $15, which meant no lawyers can represent veterans in disability claims. I don't see what else you can do to deal effectively with Justice Scalia's concern that there's no way to measure reasonableness ex post facto. I think that Justice Scalia recognized there was a problem in terms of – Recognized the problem. Yes. But his solution – His solution was –  – was to say if you really can't say ex post facto what's reasonable, like this lottery ticket example, then 25 percent is, and there's no reasonable way to cut it. It seems like the logic is a lot easier for saying there's no reasonable way to cut the fee than it is for saying there's no reasonable way to grant more than the lawyer's time's rate. Well, it's clear that Congress was concerned with a disparity in the amount of hours that were expended. Why don't we start with – let's start with four times hours times rate. Why wouldn't it be reasonable to measure windfall by looking at one factor as how much the attorney's fees award exceeds four times the hours times the reasonable hourly rate?   I think it's reasonable to say, respectfully, I think that this is what the Supreme Court says you're supposed to start with in terms of reasonableness. And then you make – you can make an enhancement above that, and that that should be left to the discretion of the district court. It says that the district court's – It says that as an aid in assessing the reasonableness, you look at those factors. Your Honor, I'm not suggesting anything more. It reversed this for starting with that. Pardon? It reversed this for starting with that. Reversed? It reversed the Ninth Circuit for starting with hourly rates. I believe the reversal was because the court in Gisbrecht, the Ninth Circuit in Gisbrecht, said that's all we're looking at. We're not looking at other factors. And that's not what the district court here did. The district court – The Ninth Circuit uses the Lodestar. The other circuits are using the contingency fee. We reversed the Ninth Circuit. Do you want to get us reversed again? No, Your Honor. But I was – What's wrong with getting us reversed again? But the court did rely on several cases in its analysis in Gisbrecht. It relied on the McGuire case. It relied on the Wells versus Sullivan. And it relied on Rodriguez. In two of those cases at least, the court – the approach the courts took in reaching a determination of reasonableness was to start with – to talk about an enhancement of the Lodestar as an appropriate method for determining a reasonable fee in Social Security cases. That's all I – Are we really talking about the primacy? I mean, Justice Ginsburg is very straight. She says, because the decision before us for review rests on Lodestar and rejects the primacy of the lawful attorney fee arrangement. We're really talking about the word primacy, aren't we, Counsel? Yes, Your Honor. And so, therefore, if the primacy is that calculation, and then one applies the factors that are outlined by justice – by the justice, at that point one solves the de novo review and we're back to discretion again. Correct, Your Honor. Well, isn't it fairly clear that you start with the contingent fee? We don't replace the contingent fee. We look at the contingent fee. That's what we start with, looking first to the contingent fee agreement, as she says, then testing it for reasonableness. If you think it's an unreasonable fee, it then tells you – you reduce that fee by certain things that you consider. If it's responsible for delay, for example, a reduction is in order. We're talking about saying, here's a contingent fee. Now, if it's unreasonable, we'll reduce it. We don't just throw it away and start from the beginning and decide what a fee should be. But the court also said, if the benefits are large in comparison to the amount of time counsel spent on the case, then it's unreasonable. Yes, and there's a downward adjustment. So what you do is you take the contingent fee and you adjust it. You reduce it by something. But in this case, didn't the courts, all the magistrates, reduce the requested fee to the amount of fee that they determined they should give? Your Honor, that's correct. At the end of the day, there has been a reduction. But at the end of the day, if you take a Lodestar and you say, this is what you ought to get, the Lodestar, of course you've reduced the contingent fee. But you haven't done – I mean, then you don't need the contingent fee at all. You just give them a Lodestar. But if you take the contingent fee and say, look, we think it's unreasonable in here. We'll reduce this fee by 10% for this or 20% for this. You have an entirely different method of doing it than if you say, well, we'll do what we did before. We'll take a Lodestar. We'll see what a reasonable fee should be. You know, and most of the people, I suspect, because I practiced in this area a long, long time ago. I know Judge Kleinfeld did as well because we come from Little Town, see? And most of the people that are practicing in this area, they're not keeping time records and Lodestars and all this and that. You know, they make it – they bring – a client comes in, they know they're tough cases. They're tough cases for us. I mean, I've seen a lot of cases where people, you read it on paper, it looks like the wreck of the Hesperus. Yet they say they can go to work and, you know, and do everything that normal people can do. But they're not keeping track of all that Lodestar business. People come in. They sign the agreement with them. Congress says 25%. That's the maximum. They go to work. They do the job. If it comes easy, if they didn't have to spend all that time, then they reduce it, which is what happened here. I thought they were pretty reasonable, the way they cut that fee down and all the time they spent. And just to go through the Lodestar seems a little ridiculous to me. I think the Supreme Court, in its infinite wisdom, would agree with me. I don't think there was a question at that point. My time is up. My time is up. Thank you. For the reasons we stated, we believe that the approach taken by the district court was within its discretion and we ask the Court to refer. Thank you. Mr. Alford, you've got a couple of minutes for rebuttal. Thank you, Your Honor. Have you ever heard a saying, don't shoot a dead duck twice? As someone who was fathered up, he was a hunter, I know that expression. Mr. Rolfing, would you please tell us what exactly the trial court did in abusing their discretion? Yes. That's the scope of our review. Yes. The Supreme Court decision in Gisbrecht cited the contingency fee cases and the lodestar cases. And one of the cases that they did not cite and say was appropriate was the Sixth Circuit decision in Hayes where the courts in Hayes, the Sixth Circuit said you get two times your lodestar. That's not permissible. And if Hayes wasn't cited by the Supreme Court, that's a pretty firm indication that Hayes does not fit in this paradigm. So did the district court rely on Hayes? No, they did worse than Hayes. How did the district court abuse its discretion then? Because if Hayes isn't appropriate, then what the district courts did here in getting less was an abuse of discretion. What did the district court do wrong? A, hyperlodestar is not permitted. You start with the contingency and work downward from there. You don't start with your hours and work up. It doesn't matter how you do that. It is a little bit of a shell game in a way. I mean, if you're trying to – suppose you have the 20 – you have whatever the amount is, the contingency amount, and you say, all right, well, this was an awful lot of work. I've looked at the hours. I just looked at them. I'm not doing a lodestar. But I can tell you that they got an awful lot of money for not very much time. What do you do next if you're a district court? Well, I think it's incumbent upon the Commissioner to come forward and say, as they've said here, that the hours that were submitted were typical and that this was a typical kind of case and that the lawyers beat the typical number of time, amount of time that lawyers put in these cases. If the Commissioner concedes that they're typical, then that means that good lawyers like Mr. Shapiro and Mrs. Haley and Mr. Cho typically put in 20 to 30 hours in these cases and they get excellent results. That's typical. Why is it that you continually say the Commissioner has to come forward? As I understand, Giesbrecht, the total burden is on you, not the Commissioner. Then I read here that the court said, you didn't come forward with the appropriate things to say what needed to be done for the adjustment of risk. You didn't come forward with a market treatment of contingency fee cases. I mean, the bottom line is that this court, you wouldn't even come forth with your hourly fee. They had to go out and do a calculation on their own of every other particular fee in the area and then try to give you the best of the general fee in the area because you didn't come forward with any information. Your Honor, that's wrong. What did happen? We submitted the fee surveys to show the court how lawyers are compensated in the community. We submitted the hourly fee surveys. We submitted the information that showed that contingency fee lawyers make 50% more than hourly lawyers. We submitted that. Okay, but you didn't come forward with your hourly fee at all, did you? Because we are contingency fee lawyers, period. Let me ask you one more question. Are you arguing in this case that the fees requested are presumptively valid? No, we're arguing that the Did you not request reverse and remand rather than reverse and order the fees originally sought? I'm sorry. You didn't request that we reverse and remand here. Your request is to reverse and order the fees that you originally sought. Seems to me that is a very good argument that you're really saying to this court, find this fee presumptively valid. If you're going to ask me to reverse and remand because it's a discretionary or a problem with de novo, then I ought to be reverse and rem, not just reverse and order your fee. The McGuire case from the Second Circuit cited by the Supreme Court says great weight to the contingency fee contract. Great weight does not mean, and to avoid satellite litigation, these cases need to come to an end. They need to come to an end.  Who's going to pay your fees for this? Me. Nobody. Well, isn't that something we should take into consideration? If you do a good job, you have a contract, the government ignores it, that one of the things you may have to do is pay your own fees to end up in a bank proceeding? That's the risk I take every day, Your Honor. Well, you should be compensated for that in some case. I hope so. Thank you, Your Honor. Time is up. Thank you very much. Thank you. The case is argued and stands submitted. We are adjourned. Thank you.
judges: En Banc Panel: Kozinski, Schroeder, Fletcher B. , Pregerson, Reinhardt, Kleinfeld, Berzon, Rawlinson, Clifton, Bea, Smith N. R.